UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


BASIM ALKHATEEB, et al.,

                    Plaintiffs,              No. 02-CV-73742-DT

vs.                                          Hon. Gerald E. Rosen

CHARTER TOWNSHIP OF WATERFORD,
et al.,

                    Defendants.
_____/


OPINION AND ORDER REGARDING
<u>MOTIONS FOR SUMMARY JUDGMENT</u>

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on _____ May 12, 2005 _____
PRESENT:  Honorable Gerald E. Rosen
                    United States District Judge


I.  <u>INTRODUCTION</u>

         This Section 1983 civil rights action is presently before the Court on Defendants'

Motion for Summary Judgment and Plaintiffs' Cross-Motion for Partial Summary

Judgment.  Having reviewed and considered the parties' briefs and supporting evidence,

and having discussed this matter with counsel for the parties during a conference held on

April 7, 2005, the Court is now prepared to rule on this matter.  This Opinion and Order

sets forth the Court's ruling.


II.  <u>FACTUAL BACKGROUND</u>

1

This action arises out of events that occurred in a residential subdivision in Waterford Township, Michigan in 2002.  In May 2002, residents of Lorena Drive in Waterford Township became aware of increasingly suspicious activity in their neighborhood involving a blue Nissan car, an ice cream truck and three men (the Plaintiffs in this lawsuit).  Marcia Bovee, a resident of the Waterford Township subdivision where the actions complained of transpired, testified that she began noticing suspicious activity taking place in front of her house on Lorena Drive in late April or early May 2002.  She testified that she first noticed that a man driving a blue Nissan appeared on Lorena Drive two to three times each week, every week for several weeks, at about the same time -- shortly after school let out for the day.[1]  The blue Nissan would enter Lorena Drive from Watkins Lake Road, make a "U-turn" and park, facing east, in front of 3515 Lorena.  (Bovee Dep., Defendants' Ex. H, p. 24).  The man would sit in his car for 20 to 30 minutes at a time, watching children play, and then he would leave.  *Id.* at 26.  One time, Mrs. Bovee watched as the man followed two 12-year-old girls from the neighborhood, while they were riding their bicycles through the subdivision.  *Id.* at 35, 82-86.  *See also* Deposition of Debra Bruce, Defendants' Ex. K, pp. 13-14.

After a few weeks, the neighbors noticed that the appearance of the Nissan was somehow related to the appearance of an ice cream truck in the neighborhood. [Bovee

---

[1]  According to the testimony of several witnesses, the subdivision is heavily populated with children. [*See e.g.*, Defendants' Ex. O, Deposition of Jill Michaels, p. 11.]

Dep., p. 28.] The blue Nissan would appear first and park on the south side of the street, facing east.  *Id.* at 31.  A few minutes later, the ice cream truck would appear and park on the north side of the street, facing west.  *Id.* at 29.  Ms. Bovee watched closely and observed that each time, the driver of the blue Nissan would exit his car and walk to the side window of the ice cream truck where the driver of the ice cream truck would hand a bag to the driver of the Nissan.  *Id.*  at 22-23, 30-31, 36.  Each time, the Nissan driver would take the bag back to his car and leave.  *Id.* at 31.[2]

Ms. Bovee had thought when she saw the man following the girls riding their bikes that the man was a child abductor; when she observed the exchange of the bags, she thought the driver was selling drugs out of the ice cream truck.  *Id.* at 36.  She testified that she contacted everyone she knew in the neighborhood and told them to be on the lookout for the blue Nissan and the ice cream truck.  *Id.* at 86, 90-91, 94.  Soon thereafter, the Waterford Police Department began receiving complaints of the suspicious

---

[2]  Throughout the course of this litigation, Plaintiffs have offered various explanations of what the neighbors on Lorena observed.  At one time, they claimed that one brother would bring the other brothers who worked the ice cream truck dinner each night and this is what the people in the neighborhood must have seen.  In another brief on a discovery motion, they claimed that they only have one car and they had to share that car.  Abedulah, who worked during the day as an engineer with Chrysler Corporation, would drive his car to work and, then when he was done at Chrysler, would meet his brothers who sold ice cream from their ice cream truck in a subdivision so that Basim could take the car to go to his night classes at Oakland University.  *See* Plaintiffs' May 19, 2003 Response to Defendants' Appeal of Memorandum Opinion and Order Granting In Part Defendants' Motion for a Protective Order.  Plaintiffs' current explanation is that Abedulah and his brother-in-law own the ice cream truck and Basim and Qasim were only helping Abedulah out with the ice cream business while his brother-in-law was on vacation.  So, for three days prior to June 20, 2002, they coordinated their work and school schedules and met in the subdivision to allow for each other's use of the car for work or school purposes.  *See* Plaintiffs' Response Brief, p.2.

activities.  *See* Deposition of Officer Dwayne Warner, Defendants' Ex. V, p. 75;

Deposition of Sergeant Kirk Simpson, Defendants' Ex. U., pp. 33, 44, 91.[3]

The next time Mrs. Bovee saw the blue Nissan pull onto Lorena, she told her two

grandsons, Thomas and Eric Michaels, to stay away from the men and the vehicles.

Bovee Dep., p. 95.  Brent Mortimer, Thomas Michaels' friend, however, had not been

warned to stay away from the vehicles, and so, when the ice cream truck stopped on the

street, Brent ran up to it and ordered an ice cream.  Thomas Michaels stood by his friend,

"to protect him."  Mrs. Bovee said that Thomas told her that he saw a bag passed from

one driver to the other, and that he saw strange looking foil packets on the floor of the

truck.  *Id.* at 100-101.  *See also*, Jill Michaels Dep., Defendants' ex. O, pp. 9-10.

When Thomas's and Eric's mother came to pick her sons up from their

grandmother's house, Mrs. Bovee told her what had happened.  Mrs. Michaels said that

she was taking Thomas directly to the police department to report the suspicious activity.

Bovee Dep., p. 99; Jill Michaels Dep., p. 11.

At 7:00 p.m. on June 17, 2002, Jill and Thomas Michaels met with Waterford

Police Sergeant Giovani Palombo.  Jill Michaels Dep. pp. 12-13, 31; Palombo Dep.,

Defendants' Ex. R, p. 93.  Mrs. Thomas explained to Officer Palombo that she did not

personally witness anything, but that her son, Michael did.  Officer Palombo,

accordingly, questioned Michael.  According to Mrs. Thomas, Michael described the men

---

[3]  Officers Simpson and Warner testified that some of these citizen complaints
came to the police department on the department's anonymous "tip hot line," others were
calls to the police department's general phone line, and some citizens reported the
activity to officers at the department's front desk.

4

in the Nissan and the ice cream truck for Officer Palombo as having "dark hair and darker skin." Jill Michaels Dep., p. 15.[4]  After meeting with Mrs. Michaels and her son, Sergeant Palombo, wrote a report and forwarded a copy of the report to the Detective Bureau, because he felt that the complaint deserved immediate attention.  Palombo Dep., pp. 53, 80, 83, 131.

Three days later, on June 20, 2002, at approximately 5:15 p.m., Mrs. Bovee again saw the blue Nissan pull onto Lorena.  Mrs. Bovee looked across the street and caught the attention of two of her neighbors, Debbie Bruce and Debbie Boik, and gestured to them to note the re-appearance of the Nissan.  Bovee Dep., pp. 37-39; Debra Bruce Dep., Defendants' Ex. K, p. 16.  The two women nodded, affirming that they, too, had noticed the car's reappearance.  *Id.*  Mrs. Boik informed Mrs. Bruce that she had heard that the blue Nissan had been observed parked on other streets in the subdivision as well and, after seeing the Nissan on Lorena again, she announced that she was calling the police.  Bruce Dep., pp. 16-17.

Debbie Boik called the Waterford Police from her cell phone in the car and spoke with Dispatcher Deborah Mathewson.  *See* Mathewson Dep., Defendants' Ex.  N., p. 14.  After hearing Mrs. Boik's account of her observations, Dispatcher Mathewson believed that the Plaintiffs were selling drugs out of the ice cream truck and felt that Mrs. Boik's complaint was sufficiently serious to justify dispatching an undercover unit.  *Id.* at 24-25.  Narcotic Enforcement Officer Rick Lemos told the dispatcher that he was familiar with

---

[4]Officer Palombo recorded the description of the men as having been given by "Ms. Michaels" and that they were "Arab."  *See* Incident Report, Plaintiffs' Ex. E.

5

the citizen complaints involving the blue Nissan and the ice cream truck.  *Id.* at 26.  He

told her that he was on his way to Lorena and would investigate, and asked that she have

marked patrol cars in the area standing by in case he needed backup.  *Id.*  Officer Scott

Good, who was also in plain clothes, also responded and was on the scene in a separate

unmarked vehicle when Officer Lemos arrived.  *See* Scott Good Dep., Plaintiffs' Ex. 3, p.

17.

Officer Lemos arrived on Lorena and observed two men (Plaintiffs Abedulah and

Qasim Alkhateeb) sitting in the blue Nissan at approximately 5:30 p.m.  Lemos testified

that he took charge of the surveillance of the blue Nissan.  Officer Good had the ice

cream truck under surveillance.  *See* Lemos Dep., Plaintiffs' Ex. R, p. 49  ; Good Dep.,

pp. 13-17.  Lemos and Good coordinated their activities via Nextel telephone.  *Id.* at p.

17.

A few minutes after Officer Lemos arrived, he saw the ice cream truck (driven by

Plaintiff Basim Alkhateeb) arrive and park on the north side of the street.  Lemos and

Good observed the Plaintiffs exit their vehicles, meet in the middle of the street,

exchange a bag of some sort, return to the opposite vehicles from which they had arrived.

Basim went to the car, placed something in the trunk, then got in the car.  Abedulah and

Qasim went to the ice cream truck.

Officer Lemos prevented the vehicles from leaving the scene by pulling his

unmarked vehicle (a truck) diagonally across the roadway.  He yelled "Police!  Stop!" as

he stepped out of the truck with a gun in his hand, and his police badge hanging on a

6

chain around his neck.  As Officer Lemos approached the Nissan, Officer Good

approached the ice cream truck.  Lemos radioed dispatch that Plaintiffs were being

detained and requested uniformed assistance.  Officers Ross and Warner arrived in their

squad car and Officer Bartle arrived shortly thereafter in a second marked car.[5]

Officer Lemos testified that he ordered Basim Alkhateeb to get out of the Nissan.

[Lemos Dep., p. 45.] Once Basim exited the car, Lemos ordered him to get on the

ground.  *Id.*  He testified that he had to repeat the directive two or three times before

Basim complied.  *Id.*  According to Lemos, Basim first knelt down, then laid down on his

stomach.  *Id.* at 46.  Within a few seconds, the uniformed unit arrived.  *Id.* at 48.  Officer

Ross assisted Officer Lemos with the detention of Basim.  *Id.* at 49-50.

Lemos testified that Officer Ross handcuffed Basim, while he stood in front of

him.  *Id.* at 50.  After Basim was handcuffed, Lemos directed Ross to pat him down.  *Id.*

Basim was then helped to his feet by Officer Ross and placed in the back seat of his

squad car.  *Id.*

Meanwhile, Officer Warner assisted Officer Good with the detention of Abedulah

and Qasim Alkhateeb.  Officer Good testified that Officer Warner handcuffed and patted

down the two men.  Good Dep., p. 27.  They, too, were assisted up off the ground and

placed in the back seat of the other squad car.  *Id.* at 55.

Officer Warner testified that, once he was assured after a pat down that there were

no handguns or weapons on the two brothers, he asked each where he could find their

-----

[5]  Officer Bartle's car was equipped with an in-car video camera and recorded the
event.

identification.  Warner Dep., Defendants' Reply Ex. 2, p. 41.  Warner said that one of the two brothers he had handcuffed indicated that his identification was in one of his pockets and Warner retrieved the ID from that pocket.  *Id.*  He then contacted Detective Lemos because he wanted him to look at the papers he had retrieved.  *Id.  See also*, Lemos Dep., p. 56.  These papers included a photo of Basim Alkhateeb in a military uniform, money transfers to Jordan, bank account information, a passage from the Koran, and a calendar page for September 2001 with a name and phone number written on it.  Warner Dep., p. 41.  The papers were given to Detective Lemos who, upon returning to the station, contacted the FBI.  Lemos Dep., p. 73.  The agent he spoke with at the FBI directed Lemos to make copies of the documents and forward them to the FBI's Detroit office, which he did.  *Id.*

At 5:42 p.m., the officers requested that Officer Quaiatto and Elvis, his drug-sniffing dog, be dispatched to Lorena.  *Id*. at 69.  Officer Quaiatto arrived at 6:00 p.m.[6] Elvis checked the vehicles for narcotics but did not make any alerts.  *Id.* at 84.  As soon as Officer Quaiatto and Elvis finished checking the vehicles, Plaintiffs were released.  Warner Dep., pp. 93-94.   According to the patrol car videotape, the entire stop lasted 38 minutes.[7]

---

[6] While waiting for the arrival of Officer Quaiatto, officers at the scene radioed dispatch asking that Plaintiffs and their vehicles be checked for any wants or warrants. *See* Ross Dep., Defendants' Ex. T, p. 75.

[7] Plaintiffs claim that their actual detention lasted 45 minutes because the video camera was not turned on until Officer Brattle arrived, and he did not arrive until after Officers Lemos and Good had already ordered Plaintiffs out of their vehicles and onto the ground.

The detention of Plaintiffs was witnessed by several neighborhood residents who were outside enjoying the summer.  Kim Mortimore and Andy Woodiwiss were picking their children up from Debbie Bruce's house; Marcia Bovee was watching her two grandsons, Michael and Eric Thomas, skateboarding in front of her house; Nikki Hellner was playing in her driveway with her 7-year-old son; and Craig and Debbie Brace were unloading new furniture and carrying it into their house.  All of these eyewitnesses testified in their depositions that the police officers conducted themselves in a calm, orderly and professional manner during the entire 38-minute investigation and that the Plaintiffs were never verbally nor physically abused.  *See* Depositions of Marcia Bovee, Defendants' Ex. H, p. 105 ("[N]othing was ever any ruckus.  Everything was peaceful. . . .  I'm thinking in my mind, 'Wow, it's not like what you see on TV,' . . .  It was the most calm thing that I had ever seen.")  *See also*, Deposition of Craig Brace, Defendants' Ex. I, p. 11-12); Deposition of Deborah Brace, Defendants' Ex. J, pp. 14-16; Deposition of Debra Bruce, Defendants' Ex. K, pp. 22-24); Deposition of Nikki Hellner, Defendants' Ex. L, pp. 66-67; Deposition of Thomas Michaels, Defendants' Ex. P, pp. 34-36); Deposition of Kimberly Mortimore, Defendants' Ex.Q,  pp. 13-23 and Deposition of Andy Woodiwiss Defendants' Ex. W, pp. 82-87 (all testifying that no one was kicked, punched, hit, slapped or otherwise touched inappropriately; no one swore at anyone; no one was called any derogatory names or referred to as "Arab" or "Arabic").[8]

---

[8]  Kimberly Mortimore's testimony is illustrative:

A:      . . . [T]he black Suburban, I think it was, pulled off of Watkins Lake Road onto Lorena, stopped, and guy got out of the car and stood like on the

running board.

Q:      Who's the guy?

A:      The guy that was in the car.  I didn't know who it was at first. . . .
        And he got out of the car, pointed his gun, he said "Police.   Get
        down on the ground."

                                    * * *

        . . .  The guy would not get down on the ground, he just kept
standing there.  He said, "Get down on the ground.  Police."  And he started
walking over --

Q:      "He" meaning --

A:      The police officer got out of the car, or got down from the running
        board of the Suburban or whatever it was he was driving, got down
        and started walking over, and the man finally put his hands behind
        his head, slowly went down to his knees, and the officer said, "All
        the way down."  And he finally slowly went down on the ground on
        his stomach.

                                    * * *

Q:      Did you have an unobstructed view of the police officer and the
        suspect from the point in time where the police officer got out of his
        vehicle to the time that the suspect laid on the ground?

                                    * * *

A:      Yes.

Q:      You could see everything that happened clearly from the time the police
        officer got out of his car to the time the suspect was on the ground, correct?

A:      Yes.

Q:      Your attention was not diverted?

A:      No.

10

Q:      Did you at any point in time from the time the police officer got out of the car to the time the suspect was down on the ground see the police officer touch the suspect?

A:      No, not until he came over to him, no.

Q:      When the police officer was first out of his car to the time the suspect was on the ground, did you see the police officer put the gun to the temple or make contact with the suspect's body in any way?

A:      With the gun?

Q:      Yes.

A:      No.

Q:      Did you see the police officer kick the suspect before he was down on the ground?

A:      No.

* * *

Q:      After the suspect was on the ground, what did you see happen next?

A:      The police officer walked over to him, still holding the gun, and he knelt down on his back to hold him down. . .

        . . . The suspect's hands were behind his neck when he was laying down on the ground. . .

        . . . And the police officer walked over to him and put his knee down on his back, put his gun away, the police officer did.

Q:      Before the police officer put the gun away, did you ever see the gun make contact with the suspect's body?

A:      No.

Q:      Did you see the police officer kick the supsect when he knelt down

11

on his back?

A:      No.

Q:      Go on. . . .

A:      The police officer got his handcuffs out and brought the suspect's hands back and handcuffed him.  And then he reached in his pockets to get his wallet, the suspect's wallet or driver's license, whatever.

* * *

Q:      . . . [D]id you hear the police officer say or ask, "Are you Arabic, are you Arabic?"

A:      No.

Q:      Did you hear the police officer say or shout any type of obscenity?

A:      No.

Q:      Did you hear the police officer say anything that you would construe as inappropriate or racist?

A:      No.

Q:      At any point in time from the time the police officer exited his vehicle to the time you turned your attention to the two suspects near the ice cream truck, did you see the police officer punch anyone?

A:      No.

Q:      Kick anyone?

A:      No.

Q:      Hit anyone?

A:      No.

Q:      Shove anyone?

A:     No.

\* \* \*

Q: Now that you turned your attention to the two people or two suspects at the ice cream truck, what, if anything did you observe?

\* \* \*

A:     Okay.  There was only one plain clothes police officer, and then the uniformed police officers got out of their cars and came over to the ice cream truck, and the one man, the one suspect from the blue car started to get into the ice cream truck, and they had their guns and they told them to get out.  So they walked out and --

Q:     Wait.  You're using "they" and "them."

A:     The suspects walked out of the ice cream truck and the police officers, uniformed police officers, had them lay down on the ground also, and that was in between Marcia Bovee's house and Nikki[' s]. . . there's a little ditch there.  So the suspects laid down on the ground, they were handcuffed.

\* \* \*

Q:     Did you see any police officer, whether he be in plain clothes or uniformed, hit either one of the suspects by the ice cream truck?

A:     No.

Q:     Kick?

A:     No.

Q:     Punch?

A:     No.

Q:     Swear at[?]

A:     No. . . .

13

On September 18, 2002, Plaintiffs initiated this Section 1983 lawsuit claiming that

Q:     Did you hear any police officer saying anything racial or ethnic to the gentlemen that were in the ditch?

A:     No.

Q:     Did you see any type of inappropriate in your opinion contact, physical contact, between any one of the police officers and the suspects that were by the ice cream truck?

A:     No.

Q:     At any point in time did you see any police officer that day kick anyone?

A:     No.

Q:     Punch anyone?

A:     No.

Q:     Grab anyone too tightly in your opinion?

A:     No.

Q:     Say, "Are you Arabic, are you Arabic?"

A:     No.

Q:     Yank them up off the ground too roughly?

A:     No.

                              *  *  *

Q:     In your own words, in your own opinion, how would you characterize the officers' conduct that day?

A:     Very professional.

Defendants' Ex. Q, pp. 12-23.

their constitutional rights were violated on June 20, 2002.  Specifically, Basim Alkhateeb

claims that Detective Lemos kicked him in the back, put a gun to his head, swore at him,

and repeatedly demanded to know whether he was Arabic.  Basim Alkhateeb Dep.,

Plaintiffs' Ex. J, pp. 154-160.  He also claims that another officer knelt down hard on the

back of his neck while he was lying prone and being handcuffed.  *Id.*  Abedulah

Alkhateeb claims that he was handled "too roughly," as though the officer thought "he

might try to escape."  Abedulah Alkhateeb Dep., Defendants' Ex. D, pp. 210-11, 215.

Qasim Alkhateeb claims that one of the officers grabbed his arm too firmly.  Qasim

Alkhateeb Dep., Defendants' Ex. F., pp. 73-74.

      Plaintiffs contend that the officers' actions were motivated because of their Arabic

ethnicity and/or religious background, and that, by the officers' actions on June 20, 2002,

their rights under the Equal Protection clause of the Fourteenth Amendment were

violated (Count I).  They further allege that they were subjected to unlawful searches and

seizures in violation of their Fourth Amendment rights (Count II).  They also allege a

*Monell* policy and practice claim against Waterford Township (Count III), and a § 1985

conspiracy claim (Count IV).  Additionally, Plaintiffs allege state law claims of ethnic

intimidation pursuant to M.C.L. § 750.147b (Count V); false imprisonment (Count VI);

assault and battery (Count VII); intentional infliction of emotional distress (Count VIII);

and gross negligence (Count IX).

      Discovery has now closed and both parties have filed motions for summary or

partial summary judgment.

## III.  DISCUSSION

A.  STANDARDS APPLICABLE TO MOTIONS FOR SUMMARY JUDGMENT

Summary judgment is proper "'if the pleadings, depositions, answer to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'"  Fed. R. Civ. P. 56(c).

Three 1986 Supreme Court cases -- *Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986); and *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) -- ushered in a "new era" in the standards of review for a summary judgment motion.  These cases, in the aggregate, lowered the movant's burden on a summary judgment motion.[9]  According to the *Celotex* Court,

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof.

*Celotex*, 477 U.S. at 322.

After reviewing the above trilogy, the Sixth Circuit established a series of principles to be applied to motions for summary judgment.  They are summarized as follows:

---

[9]"Taken together the three cases signal to the lower courts that summary judgment can be relied upon more so than in the past to weed out frivolous lawsuits and avoid wasteful trials."  10A C. Wright, A. Miller, M. Kane, Federal Practice & Procedure, § 2727, at 35 (1996 Supp.).

16

\* The movant must meet the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case. This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.

\* The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."

\* The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

\* The trial court has more discretion than in the "old era" in evaluating the respondent's evidence. The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is plausible.

*Betkerur v. Aultman Hospital Association*, 78 F.3d 1079, 1087 (6th Cir. 1996). *See also, Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989). The Court will apply the foregoing standards in deciding the summary judgment motions in this case.

B.    PLAINTIFFS HAVE NOT ESTABLISHED AN EQUAL PROTECTION CLAIM

As an initial matter, from the complete absence of any discussion in either party's briefs, it appears to the Court that Plaintiffs have abandoned their claim of violation of their Fourteenth Amendment right to Equal Protection. In any event, having reviewed the entire record of this matter, the Court finds that the record is completely devoid of evidence necessary to make out an Equal Protection claim.

The Equal Protection Clause requires that "similarly situated individuals" be treated in a like manner. *See Buchanan v. City of Bolivar, Tenn.*, 99 F.3d 1352, 1360 (6th

17

Cir.1996).  On a motion for summary judgment, the plaintiff bears the burden of

identifying disparate treatment of such "similarly situated individuals." *Id.*   Plaintiffs

here have made no showing whatsoever that non-Arabic or non-Muslim individuals were

treated differently under circumstances similar to those presented here.   Such a showing

is essential to make out a *prima facie* claim of deprivation of equal protection rights.

Because Plaintiffs have failed to meet their *prima facie* burden, Count I of their First

Amended Complaint will be dismissed.

A.   THE INVESTIGATORY STOP OF PLAINTIFFS AND THEIR VEHICLES
     WAS REASONABLE

Plaintiffs claim that their Fourth Amendment rights were violated because

Defendants did not have probable cause to believe that they were committing or had

committed a crime, and accordingly, had no legal basis to detain them, search their

pockets, or their vehicles.  Plaintiffs are mistaken in their belief that probable cause was

required for their stop and brief detention in this case.

It is well-settled that police may briefly stop an individual for investigation if they

have a "reasonable suspicion" that the individual has committed a crime.  *Terry v. Ohio*,

392 U.S. 1, 28, 88 S.Ct. 1868, 1883 (1968); *Houston v. Clark County*, 174 F.3d 809, 813

(6th Cir. 1999).  In *United States v. Sokolow*, 490 U.S. 1 (1989), the Supreme Court held

that "reasonable suspicion" entails only "some minimal level of objective justification"

for making an investigative stop -- that is "something more than an inchoate and

unparticularized suspicion or 'hunch', but less than the level of suspicion required for

probable cause." *Id.* at 7.  *See also, United States v. Hurst*, 228 F.3d 751, 757 (6th Cir.

2000) ("While an officer making a *Terry* stop must have more than a hunch, 'reasonable suspicion is considerably less than proof of wrongdoing by a preponderance of the evidence.")   In determining whether a reasonable, articulable suspicion exists in the context of an investigatory stop, the court must look at the "totality of the circumstances". *United States v. Cortez*, 449 U.S. 411, 417-18 (1981); *United States v. Arivizu*, 534 U.S. 266, 273 (2002).  As the Sixth Circuit emphasized in *United States v. Martin*, 289 F.3d 392 (6th Cir. 2002):

> . . . *Arivizu* made clear that courts must not view factors upon which police officers rely to create reasonable suspicion in isolation.  Rather, *Arivizu* stressed that courts must consider all the officers' observations, and not discard those that may seem insignificant or troubling when viewed standing alone.
>
> Furthermore, in *Arivizu*, the Supreme Court reiterated that the totality of the circumstances approach allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person.

*Id.* at 398.

Here, the suspicious activities observed by residents of the subdivision which they reported to the police, and later the direct observations of the law enforcement officers themselves provided a reasonable basis for the investigatory detention of Plaintiffs and their vehicles.  Officer Lemos testified that, drawing from the experience and knowledge he gained from "thousands" of narcotics investigations, he believed that the activities of the Plaintiffs -- a car coming into a neighborhood, sitting and waiting, then an ice cream truck arriving, the occupant of the car exiting, exchanging bags with the occupants of the

ice cream truck, then getting back into the car and leaving -- exemplified "A drug deal. I saw it every day I was undercover. A perfect example of a street drug deal." Lemos Dep., pp. 107-108.

Thus, based on the information Defendant Lemos possessed from dispatch, citizen complaints and other officers, his training, experience and familiarity with the operations of drug dealers, as well as his own observations on June 20, 2002, provided him with sufficient reasonable suspicion that Plaintiffs were engaged in criminal activity justifying a *Terry* stop.

Plaintiffs argue that the officers' drawing of firearms and handcuffing them and placing them into police cruisers converted the investigatory stop into an arrest that required probable cause. Plaintiffs' argument is not borne out by the law. As the Sixth Circuit explained in *Houston v. Clark County Sheriff*, 174 F.3d 809 (6th Cir. 1999):

> We see no Fourth Amendment violation in the conduct of [the defendant officers]. Specifically, when police officers reasonably fear that suspects may be armed and dangerous, they may order the suspects out of a car and may draw their weapons when those steps are reasonably necessary. . . . Further, detention in a police cruiser does not automatically transform a *Terry* stop into an arrest. Nor does the use of handcuffs exceed the bounds of a *Terry* stop, so long as the circumstances warrant that precaution.

174 F.3d at 814-815 (citations omitted). *See also Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 309 (6th Cir. 2005).

As the officers testified, it is common knowledge that drug transactions involve weapons and that investigating drug dealers presents serious dangers to the investigating officers. This heightened danger and the precautions necessitated by it was best

20

articulated by Officer Warner who testified:

> Due to the situation that we were involved in [as I said earlier, it was] very, very dangerous, a lot of things can go wrong in an extreme second. . . .
>
> From my experience and extensive training in scenarios such as narcotics transactions or drug transactions and personal experience of being involved in them, they can be dangerous. Weapons can be drawn and fired at you immediately. You can get hit by a [fleeing] car. You can be assaulted by the person that's handcuffed. That's happened to me before. Somebody from outside the immediate area could come in and assist the subject on the ground.

Warner Dep., pp. 54, 56, 90-91.

Furthermore, there was an added level of danger for the officers to be concerned with here -- the stop took place in a residential subdivision in the summertime where children and their parents were out of doors. Thus, in addition to concern for their own safety, the police had to be concerned for the safety of these neighborhood residents, as well.

For all of these reasons, under the circumstances presented in this case, the Court finds that the use of handcuffs and the showing of firearms was warranted and did not transform the *Terry* stop into an arrest.

Plaintiffs also argue that because they were handcuffed and detained, in their estimation, for 45 minutes, Defendants' actions amounted to an arrest rather than an investigatory stop. However, again, Plaintiffs' position is not supported by the law. Courts in this circuit have repeatedly held that there is no rigid time limit for a *Terry* stop. *See, Houston v. Clark County Sheriff, supra*, 174 F.3d at 815; *United States v. Garza*, 10 F.3d 1241, 1246 (6th Cir. 1993). when an officer's initial inquiries do not dispel the

suspicion that warranted the stop, further detention and questioning are appropriate.

*Houston, supra.*  As the Supreme Court stated in *Michigan v. Sommers*, 452 U.S. 692

(1981), "[I]f the purpose underlying a *Terry* stop -- investigating possible criminal

activity -- is to be served, the police must under certain circumstances be able to detain

the individual for longer than the brief time period [that was] involved in *Terry*.  *Id.* at

700 n. 12.

In this case, the duration and the detention of Plaintiffs was no longer than

necessary to complete their investigation of the Plaintiffs' identity and to dispel their

suspicions of narcotics trafficking.  As soon as Defendants determined that no narcotics

were on Plaintiffs' person or in their vehicles, Plaintiffs were released.

Moreover, the patdowns of Plaintiffs and the search of their persons for weapons

is entirely legal in a *Terry* stop situation.  In fact, the Supreme Court stated as much in

*Terry* itself: The Fourth Amendment permits "a reasonable search for weapons for the

protection of the police officer, where he has reason to believe that he is dealing with an

armed and dangerous individual regardless of whether he has probable cause to arrest

[that] individual for a crime."  *Terry*, 392 U.S. at 25.  The officer need not be absolutely

certain that the individual is armed; the issue is whether a reasonable prudent man in the

circumstances would be warranted in the belief that his safety and that of others might be

in danger.  *Id.*

In this case, as indicated above, the officers had reason to believe that Plaintiffs

were involved in drug dealing and knew that drug dealing usually involves the use of

weapons.  Thus, they were justified to search Plaintiffs for weapons.

Plaintiffs also claim that the use of the K-9, "Elvis," in sniffing the ice cream truck without their consent and without a warrant constitutes an unlawful search.  However, the Sixth Circuit has held that a canine sniff is not a search within the meaning of the Fourth Amendment.  *See United States v. Reed*, 141 F.3d at 650.

For all of the foregoing reasons, the Court finds no legally cognizable basis for Plaintiffs' claim that the officers violated their Fourth Amendment rights by virtue of the investigatory stop, their brief detention in handcuffs, and the search of their persons and property.

C.    MATERIAL ISSUES OF FACT PRECLUDE SUMMARY JUDGMENT ON
      PLAINTIFF BASIM ALKHATEEB'S EXCESSIVE FORCE CLAIM

Plaintiffs also claim that the Defendant officers are liable to them for damages

pursuant to § 1983 because they contend that the officers used excessive force in the

course of their investigation on June 20, 2002.  Defendants deny using excessive force

and contend that they are not liable for damages because only "reasonable force" was

used.

In *Graham v. Connor*, 490 U.S. 386, 109 S. Ct. 1865 (1989), the Supreme Court

established a number of guidelines to be followed by lower courts in evaluating claims

alleging excessive force in the course of an arrest or detention.  First, because these

questions involve seizures, the Fourth Amendment "reasonableness" test is the

appropriate standard by which such claims are to be judged.  109 S. Ct. at 1871.  The

Court continued:

> Determining whether the force used to effect a particular seizure is
> "unreasonable" under the Fourth Amendment requires a careful balancing
> of the nature and quality of the intrusion on the individual's Fourth
> Amendment interests against the countervailing governmental interests at
> stake. . . .  Our Fourth Amendment jurisprudence has long recognized that
> the right to make an arrest or investigatory stop necessarily carries with it
> the right to use some degree of physical coercion or threat thereof to effect
> it.

109 S. Ct. at 1871-72 (citations omitted).  The Court added:

> The "reasonableness" of a particular use of force must be judged from the
> perspective of a reasonable officer on the scene, rather than with the 20/20
> vision of hindsight. . . .  The calculus of reasonableness must embody
> allowance for the fact that police officers are often forced to make split-
> second judgments -- in circumstances that are tense, uncertain, and rapidly
> evolving -- about the amount of force that is necessary in a particular

24

situation.

109 S. Ct. at 1872. *See also Walton v. City of Southfield*, 995 F.2d 1331, 1342 (6th Cir. 1993); *Leber v. Smith*, 773 F.2d 101, 105 (6th Cir. 1985) ("The issue we must address, then, is whether [the police officer's] actions were reasonable under the Fourth Amendment. . . . [c]onsidering [all] the factual circumstances surrounding the incident in question . . . .), *cert. denied*, 475 U.S. 1084, 106 S. Ct. 1466 (1986); *Damron v. Pfannes*, 785 F. Supp. 644, 647 (E.D. Mich. 1992).

Finally, as the *Graham* Court explained, the state of mind of the officers at the time of arrest has no bearing on the reasonableness of their actions at the time of the arrest:

> Whatever the empirical correlations between "malicious and sadistic" behavior and objective unreasonableness may be, the fact remains that the "malicious and sadistic"  factor puts in issue the subjective motivations of the individual officers, which our prior cases make clear has no bearing on whether a particular seizure is "unreasonable" under the Fourth Amendment.

109 S.Ct. at 1872. *See also, Branham v. City of Dearborn Heights*, 830 F.Supp. 399, 401 (E.D.Mich. 1993).

While the foregoing standards make clear that, depending on the circumstances, some limited force may be reasonable, the record evidence of this case establishes that there exists a genuine issue of material fact regarding the degree of force used by the officers with regard to the detention of Plaintiff Basim Alkhateeb.

Defendants all deny any kicking or punching, deny putting a gun to anyone's head, and deny using anything more than reasonable force in handcuffing and placing the

Plaintiffs in the patrol cars.  The Defendants testimony is corroborated by that of a number of witnesses.  Plaintiff Basim Alkhateeb, however, testified in his deposition to being kicked and punched and threatened with a gun to his head, and there is medical evidence that Plaintiff sustained some injuries.  It is not the role of the Court at summary judgment to weigh the credibility of the witnesses.  In light of this contradictory evidence, summary judgment on Plaintiffs' § 1983 excessive force claim clearly would be inappropriate as to Plaintiff Basim Alkhateeb.[10]

However, with regard to Plaintiffs Abedulah and Qasim Alkhateeb, their complaint is only that someone held their arms "too firmly" or "too roughly."  *See* Abedulah Alkhateeb Dep., Defendants' Ex. D, pp. 210-211, 215; Qasim Alkhateeb Dep., Defendants' Ex. F., pp. 73-74).  "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers violates the Fourth Amendment." *Graham v. Conner, supra*, 109 S.Ct. at 1872.

In *Bur v. Gilbert*, 415 F.Supp. 335 (E.D.Wis.1976), the court rejected the plaintiff's Section 1983 claim of excessive force for injuries sustained was arrested pursuant to a warrant issued after he failed to appear in court for a traffic violation. He sustained an injury to his wrist which he claimed was caused by the rough handling of the police officers in handcuffing him. Nevertheless, the court concluded:

> [T]he Court will assume, without finding, that the plaintiff was handled discourteously and that the use of handcuffs in this situation was unnecessary. The fact remains, however, that the use of such minimal force

---

[10]  This same contradictory evidence as to the reasonableness of force used by the officers compels denial of summary judgment on qualified immunity grounds, as well.

26

is not uncommon or unusual in the course of an arrest. For the Constitution to be violated, the force used must be excessive. While the law does not require that serious or permanent injuries result, the law does require that the force used be more than the mere technical "battery" that is inextricably a part of any arrest[.]

*Id.* at 341. *See also Nemeckay v. Rule*, 894 F. Supp. 310 (E.D. Mich. 1995) (same); *Johnson v. Morel*, 876 F.2d 477, 480 (5th Cir.1989) (en banc) ("significant injury" required for § 1983 excessive force claim).

As this Court emphasized in *Nemeckay*, *supra* the use of force must be "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." 894 F. Supp. at 315 (citing *Graham v. Conner*, *supra*, 490 U.S. at 396, 109 S.Ct. at 1872.

Applying the above authorities in this case, the Court finds that the record evidence does not support Plaintiffs Abedulah and Qasim Alkhateeb's claims of excessive force. Being held "too firmly" or handled "too roughly" do not establish a Section 1983 excessive force claim. Therefore, the Court will grant Defendants' Motion for Summary Judgment and deny Plaintiffs' Motion for Summary Judgment with respect to the Count II claims of these two Plaintiffs. *See Donald v. Wilson*, 847 F.2d 1191, 1194 (6th Cir. 1988). Only Plaintiff Basim Alkhateeb's excessive force claim survives summary judgment.[11]

---

[11] Plaintiffs' Section 1985 claims in Count IV of their First Amended Complaint are subsumed in their Section 1983 claims. In *Donald v. Wilson*, 847 F.2d 1191 (6th Cir. 1988), the Sixth Circuit held that where all of the defendants are public officials and admittedly acting under color of law, there was no need to assert a claim under § 1985 which is designed to reach concerted state action. *Id.* at 1194. Under such circumstances, whatever claim a plaintiff may have against public officials, if it survives

27

D.     PLAINTIFFS HAVE FAILED TO MAKE OUT A *MONELL* CLAIM AGAINST
WATERFORD TOWNSHIP

In Count III of their Complaint Plaintiffs allege a claim of violation of constitutional rights against Waterford Township claiming that through its police department, the Township pursued policies, practices and customs which they claim caused their search and seizure on June 20, 2002.   The only "policy" identified by Plaintiffs is what they allege to be an "unwritten custom" employed by the Township. They base their claim of a custom on the deposition testimony of (1) Officer Lemos who testified that it is the "custom" of the police to handcuff and place suspects in the back of a police car during a *Terry* stop, and (2) Officer Good who stated in his incident report of the June 20, 2002 stop that the "occupants of both vehicles were removed and detained *using standard officer safety precautions.*" (Plaintiffs' Ex. D, emphasis added).

It is well-settled that a municipality cannot be held liable under 42 U.S.C. § 1983 based on a theory of respondeat superior.  Municipal liability can only be imposed if the injuries are inflicted pursuant to a municipality's policy or custom.  *Monell v. Dept. of Social Services*, 436 U.S. 658, 690-95 (1978).  The plaintiff must show not only that the City pursued an official policy or custom, but also  that such official policy or custom was adopted by the official makers of policy with 'deliberate indifference' towards the constitutional rights of persons affected by the policy or custom. *City of Canton v. Harris*, 489 U.S. 378, 387-88.  *See also*, *Collins v. City of Harker Heights*, 503 U.S. 115,

---

at all, is properly submitted to the jury under a § 1983 theory.  *Id.*  Since all of the defendants are public officials and were admittedly acting under color of law, there is no need for a claim under § 1985.  Accordingly, Count IV will be dismissed.

120-24, (1992); *Haverstick Enterprises v. Financial Federal Credit*, 32 F.3d 989, 996 n.

8 (6th Cir.1994); *Mumford v. Basinski*, 105 F.3d 264, 267 (6th Cir.1997).  Further, the

alleged policy must be the "moving force of the constitutional violation." *Monell, supra*

at 694.  As enunciated by the Sixth Circuit, this requires that the plaintiff "identify the

policy, connect the policy to the city itself and show that the particular injury was

incurred because of the execution of that policy." *Garner v. Memphis Police Dept.*, 8 F.

3d 358, 364 (6th Cir. 1993).

Furthermore, in *Oklahoma v. Tuttle*, 471 U.S. 808 (1985), the Supreme Court held

that a single act of misconduct by an officer was insufficient to impose municipal

liability.  Where the policy itself is not unconstitutional, "considerably more proof than

the single incident would be necessary. . . to establish both the requisite fault on the part

of the municipality, and the causal connection between the policy and the constitutional

deprivation.  *Id.  See also, Sudel v. City of Hamtramck*, 221 Mich. App. 445, 562 N.W.2d

478 (1997):

> As a matter of pure logic, a single incident does not a custom, policy or
> practice make. . . .  Where a policy maker's decision does not itself directly
> order or authorize a constitutional violation, more than a single incident
> should be necessary to establish causation.

*Id.* at 469-70.

Plaintiffs here have not met the above standards.  As indicated, the only "policy"

they point to is the police practice of handcuffing individuals and placing them in squad

cars during a *Terry* stop.  This is not an unconstitutional practice.  *See* discussion in

Section C above.  Further, they have only evidence of this single incident on June 20,

29

2002, which as indicated, is insufficient to establish municipal liability. Finally, the act of handcuffing and being placed in patrol cars was not what *caused* Plaintiffs' alleged injuries. Lacking this causal nexus, their claim against the Township fails as a matter of law.

For the foregoing reasons, the Court will grant Defendants' Motion for Summary Judgment and deny Plaintiffs' Motion for Summary Judgment on Count III.

E.  <u>STATE LAW CLAIMS</u>

In addition to their federal claims, Plaintiffs have asserted a panoply of state law claims in Counts V through IX of their First Amended Complaint. These include common law claims of false imprisonment, assault and battery, intentional infliction of emotional distress and gross negligence, and a statutory claim of ethnic intimidation.

First, with regard to their "ethnic intimidation" claim, the Court finds that Plaintiffs have failed to make out the statutory elements of such a claim.

Under M.C.L. § 750.147b:

A person is guilty of ethnic intimidation if that person **maliciously, <u>and with specific intent to intimidate or harass</u>** another person because of that person's race, color, religion, gender or national origin, does any of the following:

(a) Causes physical contact with another person.

(b) Damages, destroys, or defaces any real or personal property of another person.

(c) Threatens by word or act, to do an act described in subdivision (a) or (b), if there is reasonable cause to believe that an act described in subdivision (a) or (b) will occur.

30

M.C.L. § 750.147b.[12]

As indicated, proof that the Defendants acted "maliciously" and "with specific intent" to intimidate or harass the Plaintiffs because of their national origin is are essential elements of an ethnic intimidation claim. In fact, the only evidence that Plaintiffs' ethnicity was even mentioned by the officers is Plaintiff Basim Alkhateeb's testimony that Officer Lemos asked him, "Are you Arabic?" This is denied by Defendants. But even accepting Plaintiff's testimony as true, there is no evidence demonstrating that the Defendants acted maliciously and with specific intent to intimidate or harass them because of their Arabic nationality. Therefore, this claim will be dismissed.

Plaintiffs' common law claims of false imprisonment and intentional infliction of emotional distress, and Plaintiffs Abedulah and Qasim Alkhateeb's claims of assault and battery and gross negligence similarly fail because Defendants are cloaked with governmental immunity.

M.C.L. § 691.1407 provides immunity for governmental agencies and governmental employees. With respect to governmental agencies, M.C.L. § 691.1407(1) provides:

> Except as otherwise provided in this act, all governmental agencies is immune from tort liability if the governmental agency is engaged in the exercise or discharge of a governmental function.

"Governmental function" is defined as "any activity which is expressly or impliedly mandated or authorized by constitution, statute or other law." *Ross v.*

---

[12] The Michigan statute carries both criminal and civil penalties.

*Consumer's Power*, 420 Mich. 567, 591 (1984).  This immunity extends to claims of

negligence, as well as claims of intentional torts.  *Smith v. Department of Mental Health*,

428 Mich. 540 (1987); *Bell v. Fox*, 206 Mich. App. 522, 525, 522 N.W.2d 869, 871

(1994).

The operation of a police department is a governmental function.  *See Hill v.

Saginaw*, 155 Mich. App. 161 (1986).  The focus of the inquiry into whether an activity is

a governmental function is the general activity and not the specific conduct.  *Ross, supra*,

420 Mich. at 621.  This focus is "broad and encompasses most of the activities

undertaken by governmental agencies."  *Id.*   Thus, the proper focus in this case is the

operation of a police department.

The foregoing discussion regarding the Michigan governmental immunity statute

as it applies to governmental agencies makes clear that Waterford Township is immune

from liability on Plaintiffs' claims of false imprisonment, assault and battery, gross

negligence, and intentional infliction of emotional distress.

With respect to governmental employees, § 691.1407(2) provides immunity from

tort liability as follows:

(2)  Except as otherwise provided in this section, and without regard to the
discretionary or ministerial nature of the conduct in question, each officer
and employee of a governmental agency, each volunteer acting on behalf of
a governmental agency, and each member of a board, council, commission
or statutorily created task force of a governmental agency is immune from
tort liability for injuries to a person or damage to property caused by the
officer, employee, member, or volunteer while acting on behalf of a
governmental agency if all of the following are met:

(a)  The officer, employee, member, or volunteer is acting or
reasonably believes he or she is acting within the scope of his or her

32

authority.

(b) the governmental agency is engaged in the exercise or discharge of a governmental function.

(c) The officer's, employee's, member's, or volunteer's conduct does not amount to gross negligence that is the proximate cause of the injury or damage. As used in this subdivision, "gross negligence" means conduct so reckless to demonstrate a substantial lack of concern for whether an injury results.

(3) Subsection (2) does not alter the law of intentional torts as if it existed before July 7, 1986 [the effective date of the statute.]

M.C.L. § 691.1407(2),(3).

In this case, Plaintiff has alleged four Michigan state law tort claims against the Defendants -- false imprisonment, assault and battery, intentional infliction of emotional distress, and gross negligence. Although three of the torts alleged are "intentional" torts, the Michigan Supreme Court has expressly ruled that "[t]here is no 'intentional tort' exception to governmental immunity." *Smith v. Department of Public Health*, 428 Mich. 540, 544, 410 N.W.2d 749, 751 (1987). *See also, Bell v. Fox, supra*. Intentional torts are assessed on the basis of the conduct complained of under the statutory "gross negligence" standard. *Bell, supra*, 522 N.W.2d at 871. Thus, so long as the officer or employee of a governmental agency is acting, or reasonably believes he is acting within the scope of his authority, and the facts forming the basis of the plaintiff's intentional tort claims do not constitute "conduct so reckless as to demonstrate a substantial lack of concern for whether an injury result", he is protected from suit by governmental immunity. *Id.*

In *Bell v. Fox*, the Michigan Court of Appeals held that when police have lawful authority to act, their conduct cannot amount to gross negligence within the meaning of

33

M.C.L. § 691.1407(2).  Accordingly, the court affirmed the trial court's grant of defendants' motion for summary disposition on the plaintiff's intentional tort claims for assault and battery, false arrest, false imprisonment, intentional infliction of emotional distress, and malicious prosecution.  522 N.W.2d at 871.

In this case, there is nothing in the record to suggest that Defendants were acting outside of the scope of their authority when they conducted the investigatory stop of Plaintiffs on June 20, 2002.  It is the activity engaged in by the officers at the time of the torts, underline not the allegedly tortious conduct that is determinative.  *Smith v. Dep't of Public Health, supra,*  428 Mich. at 609, 410 N.W.2d at 779; *Smith v. Yono*, 613 F. Supp. 50, 53-54 (E.D. Mich. 1985).  Furthermore, there is nothing in the record to support any of Plaintiffs' theories of liability that the conduct of the officers amounts to conduct "so reckless as to demonstrate a substantial lack of concern for whether an injury results".  Therefore, there is nothing from which "gross negligence", as defined within the statute, may be inferred so as to deny the officers the protection of the Governmental Immunity Statute with respect to these claims.[13]

_____

[13]  Furthermore, even on the merits, Plaintiffs' claims of "false imprisonment" and "intentional infliction of emotional distress" fail.

With respect to the "false imprisonment" claim, it is undisputed that Plaintiffs were never arrested or taken into custody.  Viewed in the light most favorable to Plaintiffs, they were detained as part of an investigative stop which is permitted under *Terry v. Ohio*, 392 U.S. 1 (1968), and it is well-settled that a brief investigatory detention does not constitute an "arrest" under Michigan law.  *See Bonkowski v. Arlan's Department Store*, 383 Mich. 90, 96 (1970).

As for Plaintiffs' claim of intentional infliction of emotional distress, in *Roberts v. Auto Owners Insurance Co.*, 422 Mich. 594, 602 (1985), the Michigan Supreme Court

34

However, just as issues of fact exist with regard to Plaintiff Basim Alkhateeb's claim of excessive force, the same issues of fact which precluded summary judgment on that claim also preclude a finding that the defendant officers are protected by governmental immunity on Basim's assault and battery and gross negligence claim. Viewing the evidence in a light most favorable to Plaintiffs as the Court is compelled to

---

declined to adopt the tort of intentional infliction of emotional distress into Michigan jurisprudence on the facts presented in that case, but described the standards that would have to be met for satisfaction of such a claim:

> The cases thus far decided have found liability only where the defendant's conduct has been extreme and outrageous.  It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he had intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff for punitive damages for another tort.  <u>Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.  Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"</u>
>
> <u>The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppression or other trivialities.</u>  The rough edges of our society are still in need of a good deal of filing down, and in the meantime <u>plaintiffs must necessarily be expected and required to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind</u>. There is no occasion for the law to intervene in every case where someone's feelings are hurt. There must still be freedom to express an unflattering opinion, and some safety valve must be left through which irascible tempers may blow off relatively harmless steam.

*Id.* at 602, citing Restatement, Torts 2d, § 76 comment d (emphasis added).

Here, this Court does not find the actions of the defendant officers to be outrageous or extreme in character under the foregoing standards.

35

do, issues of fact remain as to whether the officers' conduct with regard to Plaintiff Basim

Alkhateeb was "so reckless as to demonstrate a substantial lack of concern for whether an

injury results."

<u>CONCLUSION</u>

For all of the foregoing reasons,

IT IS HEREBY ORDERED that Defendants' Motion for Summary Judgment is GRANTED, in part, and DENIED, in part.  Summary Judgment is GRANTED in favor of Defendants with respect to Plaintiffs' claims in Count I, Count III, Count IV, Count V, Count VI, and Count VII.  Summary Judgment is also GRANTED in favor of the Defendants with respect to Plaintiffs' claims of unreasonable search and seizure under the Fourth Amendment, as alleged in Count II, and in favor of all of the Defendants as to Plaintiffs Abedulah and Qasim Alkhateeb's Fourth Amendment claims of excessive force, and for assault and battery (Count VIII) and gross negligence (Count IX).  Defendants' Motion for Summary Judgment is DENIED with respect to Plaintiff Basim Alkhateeb's Fourth Amendment claim of excessive force in Count II, and his claims of assault and battery in Count VIII and gross negligence in Count IX.

IT IS FURTHER ORDERED that Plaintiffs' Motion for Partial Summary Judgment as to Counts I, II, III, IV, and VI is DENIED.


s/Gerald E. Rosen_____
Gerald E. Rosen
United States District Judge

Dated:  May 12, 2005

I hereby certify that a copy of the foregoing document was served upon counsel of record on May 12, 2005, by electronic and/or ordinary mail.

s/LaShawn R. Saulsberry_____
Case Manager